In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00007-CR


______________________________




JOHNNY EDWARD DOUTHIT, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 8th Judicial District Court


Hopkins County, Texas


Trial Court No. 9915633




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Ross



O P I N I O N



 Johnny Edward Douthit appeals his conviction by a jury of indecency with a child by
contact. The jury assessed punishment at twenty years' imprisonment and a $10,000.00
fine. The issue at trial was whether Douthit had sexual contact with M. D., a child, in
violation of Tex. Pen. Code Ann. § 22.011 (Vernon 2003).

On appeal, Douthit contends: (1) the trial court erred by overruling his motion for
a directed verdict; (2) the evidence was factually insufficient to support the verdict; and
(3) the trial court violated his constitutional right to confrontation by quashing his subpoena
for the child, finding the child unavailable, and admitting into evidence a videotaped
interview with the child.

 Douthit first contends the trial court erred by overruling his motion for a directed
verdict because the evidence was legally insufficient to meet the State's burden on the
indicted offense. 

 A point of error complaining about a trial court's failure to grant a motion for a
directed verdict is a challenge to the legal sufficiency of the evidence. See Turner v. State,
No. 01-01-00204-CR, 2003 Tex. App. LEXIS 2319, at *31 (Tex. App.-Houston [1st Dist.]
Mar. 20, 2003, no pet. h.); see also Williams v. State, 937 S.W.2d 479, 482 (Tex. Crim.
App. 1996). A legal sufficiency challenge requires an appellate court to view the evidence
in the light most favorable to the prosecution and determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable doubt. 
Turner, 2003 Tex. App. LEXIS 2319, at *31 (citing King v. State, 29 S.W.3d 556, 562 (Tex.
Crim. App. 2000)). Although our analysis considers all evidence, we may not reweigh the
evidence and substitute our judgment for that of the jury. King, 29 S.W.3d at 562.

 Douthit moved for a directed verdict based on the State's failure to meet its burden
of proof on the indicted offense, aggravated sexual assault pursuant to Tex. Pen. Code
Ann. § 22.011(a)(2)(A). The jury, however, found Douthit "not guilty" of aggravated sexual
assault, but "guilty" of the lesser included offense of indecency with a child pursuant to
Tex. Pen. Code Ann. § 21.11 (Vernon 2003). Thus, the question of whether the trial court
erred in denying Douthit's motion for a directed verdict for aggravated sexual assault is
moot. Even so, there was more than a scintilla of evidence on each element of the indicted
offense to submit the issue to the jury. 

The indictment alleged Douthit, "on or about the 25th day of June, 1999, . . .
intentionally and knowingly cause[d] the penetration of [the] female sexual organ of [M. D.],
a child who was then and there younger than 14 years of age and not the spouse of the
defendant, by any means." See Tex. Pen. Code Ann. § 22.011(a)(2)(A). (1)
 M. D., born
November 30, 1994, was four years of age on the alleged date of the offense and five
years of age at the time of Douthit's trial. 

The record contains the following evidence of Douthit's guilt of the indicted offense.
Douthit admitted physically touching M. D.'s vagina. Specifically, Douthit told Detective
David Gilmore that, on one occasion when M. D. was six months old, he touched her
vagina with his hand and wished his face were as smooth as her vagina. According to
Gilmore, when he asked Douthit if the touching referred to penetration, Douthit responded
that he touched M. D. with his finger. 

 In addition to these admissions by Douthit, Ginger Brooks, a licensed therapist who
works with sexually abused children, testified M. D. told her Douthit put his hands down her
panties and "touched [her] bo-bo." "Bo-bo" is the name by which M. D. referred to her
vagina, as well as her "butt." M. D.'s mother testified M. D. complained of her "bo-bo"
hurting quite a bit. 

 Brooks testified she believed Douthit sexually molested M. D. Penny West, another
licensed counselor, testified M. D.'s behavior was consistent with a child who had been
sexually molested. 

 In addition to this evidence, the State presented medical evidence from Dr. Annette
Horner, who examined M. D. July 12, 1999. Horner testified her examination revealed
M. D. had a detached hymen. Horner testified that, in order to detach the hymen,
"[s]omething has to be inserted into the vagina." When asked how long ago M. D.'s hymen
had been detached, Horner testified it had not been recent since there was no blood or
bruising. 

Viewing the evidence in the light most favorable to the prosecution, we conclude 
a rational trier of fact could have found beyond a reasonable doubt the State presented
legally sufficient evidence on the elements of the charged offense. Therefore, the trial
court's denial of Douthit's motion for a directed verdict was proper. Douthit's first point of
error is overruled. 

 Douthit also challenges the factual sufficiency of the evidence to support the jury's
verdict. But Douthit offers no authority or argument on this issue; thus, it is inadequately
briefed. See Tex. R. App. P. 38.1(h); Reed v. State, 48 S.W.3d 856, 863-64 (Tex.
App.-Texarkana 2001, pet. ref'd). Even so, we find the evidence more than factually
sufficient to support the jury's verdict finding Douthit guilty of indecency with a child by
contact. Douthit's second point of error is overruled.

Douthit contends in his third point of error he was denied his constitutional right to
confrontation and cross-examination when the trial court quashed his subpoena for M. D.
and allowed videotape evidence of interviews with M. D. by a child advocacy counselor. 
We will review the issues of the videotape admission and the quashed subpoena
separately. 

 Douthit contends the trial court should not have admitted the videotaped interviews
into evidence because of a Confrontation Clause violation and because such interviews
were hearsay. Douthit, however, made neither of those objections at trial. His only
objection at trial was based on witness competency. (2)
 Douthit therefore failed to preserve
error based on hearsay or the Confrontation Clause. (3) See Tex. R. App. P. 33.1; Simmons
v. State, No. 06-01-00142-CR, 2003 Tex. App. LEXIS 766, at *18 (Tex. App.-Texarkana
Jan. 27, 2003, pet. filed). Douthit did, however, preserve error on the issue of whether
quashing his subpoena for M. D. violated his Sixth Amendment right to confrontation and
cross-examination. 

 The Sixth Amendment to the United States Constitution guarantees a defendant the
right to confront the witnesses against him. U.S. Const. amend. VI; Pointer v. Texas, 380
U.S. 400 (1965). A trial court violates a defendant's right of confrontation if it improperly
limits appropriate cross-examination. Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim.
App. 1996). The Confrontation Clause and cross-examination exist in part to ensure
fairness in criminal proceedings. Offor v. Scott, 72 F.3d 30, 33-34 (5th Cir. 1995). Through
cross-examination, a defendant tests the believability of a witness and the truth of that
witness' testimony. Davis v. Alaska, 415 U.S. 308, 316 (1974). 

Although a defendant's right to confrontation and cross-examination is
constitutionally safeguarded, the right is not absolute. Chambers v. Mississippi, 410 U.S.
284, 295 (1973); Sherman v. State, 20 S.W.3d 96, 100 (Tex. App.-Texarkana 2000, no
pet.). The trial court retains great latitude in limiting cross-examination. Sherman, 20
S.W.3d at 100. Specifically, a trial court may limit cross-examination when the cross-examination might cause harm to the witness. Id.; see Delaware v. Van Arsdall, 475 U.S.
673, 679 (1986); Carroll, 916 S.W.2d at 498.

We agree with Douthit's contention that quashing his subpoena for M. D. had the
effect of denying him the opportunity to cross-examine her. Our task, then, is to determine
whether this limitation was an abuse of the trial court's discretion. See Love v. State, 861
S.W.2d 899, 903 (Tex. Crim. App. 1993); Sherman, 20 S.W.3d at 100. This inquiry
depends on the facts of each case. Love, 861 S.W.2d at 904.

Here, the trial court based its decision to quash the subpoena for M. D. on a finding
of unavailability under Tex. Code Crim. Proc. Ann. art. 38.071, §§ 6, 7, 8 (Vernon Supp.
2003). This statute specifically authorizes, in limited circumstances, the testimony of a
child victim by means other than the traditional in-court method. After hearing evidence
on the factors allowed by the statute, the trial court specifically found the child was
unavailable as defined in the statute. In making this finding, the court considered several
factors, including: (1) "the relationship of the defendant to the child"; (2) "the
characterization of the alleged offense"; (3) the age, maturity, and emotional stability of the
child"; and (4) the "emotional or psychological harm [that] would come to the child if the
child was to testify in front of [Douthit] as well as the jury." Douthit made no objection to
the trial court's findings and does not challenge the sufficiency of those findings. Rather,
his only contention on appeal is the effect the decision to quash had on his ability to
confront and cross-examine M. D. 

 The factors stated by the trial court-most notably the reference to psychological
harm to M. D.-indicate the trial court quashed the subpoena of M. D. to prevent harm to
her. The trial court was authorized to do this pursuant to Article 38.071. No claim is made
on appeal that this statute is unconstitutional, and we conclude that quashing the
subpoena was within the trial court's sound discretion under this statute. Douthit's third
point of error is overruled.

 We affirm the judgment.




 Donald R. Ross

 Justice


Date Submitted: February 27, 2003

Date Decided: April 24, 2003


Do Not Publish

1. 
[1]This language represents an amendment to the original indictment. In his brief, Douthit
relies on the original indictment, which required the State to prove Douthit caused the
"sexual organ of [M. D.] . . . to contact the sexual organ of the Defendant." (Emphasis
added.)

2. 
[2]Douthit does not raise the issue of witness competency on appeal. 

3. 
[3]Both Douthit and the State focus extensively on the analysis set forth in Idaho v. Wright,
497 U.S. 805 (1990), outlining the process for admitting hearsay evidence when a child is
found unavailable. However, we need not engage in this analysis because no error was
preserved on this issue. 


ty="61" SemiHidden="false"
 UnhideWhenUsed="false" Name="Light List Accent 6"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00022-CV

                                                ______________________________

 

 

 

                              IN THE INTEREST OF
B.G.M., A CHILD

 

 

 

                                                                                                  


 

 

                                       On Appeal from the 115th
Judicial District Court

                                                            Marion County, Texas

                                                          Trial Court
No. 08-00106

 

                                                      
                                            

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                     MEMORANDUM 
OPINION

 

            Bud
and Rhonda Marks, parents of B.G.M., appeal from a final order in a suit
affecting the parent-child relationship brought by the Texas Department of
Family and Protective Services (TDFPS). 
B.G.M.s aunt, Sally Tarter, as well as B.G.M.s sister, Tiffany Parsley,
and her husband, John Parsley, intervened in the suit and sought
conservatorship of the child.  Trial to a
jury resulted in a unanimous finding that possession of the child by her
parents would significantly impair the childs physical health or emotional
development and that Tarter should be appointed managing conservator of the
child.  The trial courts judgment
appointed Tarter sole managing conservator of B.G.M.; listed Bud, Rhonda, and
Tiffany as possessory conservators; gave only Rhonda limited telephone and
therapeutic visitation rights; and ordered Bud and Rhonda to pay child support.  

            The
Markses appeal the trial courts judgment alleging that the evidence is
insufficient to rebut the presumption that it is in B.G.M.s best interest to
appoint them as joint managing conservators. 
They also complain that the trial court erred when it admitted a summary
of an investigators testimony and notes of his investigation over hearsay and
bolstering objections.  We affirm the
judgment of the trial court. 

I.          Sufficient Evidence
Supported the Trial Courts Judgment

            A.        Standard of Review

            The best interest
of the child is always the primary consideration in determining issues of
conservatorship, access, and possession.  Tex.
Fam. Code Ann. § 153.002 (West 2008); In re M.T.C., 299 S.W.3d 474, 479 (Tex. App.Texarkana 2009, no
pet.).  Because the trial court is in a
position to analyze the facts with regard to issues of conservatorship,
control, possession, child support, and visitation, the trial court is given
wide latitude in determining the best interests of a minor child.  Id. (quoting
Stallworth v. Stallworth, 201 S.W.3d
338, 347 (Tex. App.Dallas 2006, no pet.); Gillespie
v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982)).  For that reason, a trial courts order
regarding conservatorship is reviewed under an abuse of discretion
standard.  Id.; In  re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007); Gillespie,
644 S.W.2d at 451; In re Marriage of
Edwards, 79 S.W.3d 88, 98 (Tex. App.Texarkana 2002, no pet.).  A trial court abuses its discretion only if
it acts arbitrarily and unreasonably or without reference to any guiding rules
or principles.  Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 24142 (Tex. 1985). 
A trial court does not abuse its discretion if some evidence of
substantive and probative character exists to support the trial courts
decision.  Id.; In re J.P.C., 261
S.W.3d 334, 336 (Tex. App.Fort Worth 2008, no pet.). 

            Section
153.131 of the Texas Family Code creates a rebuttable presumption that the
appointment of the parents as managing conservators is in the best interest of
the child.  Tex. Fam. Code Ann. § 153.131(a) (West 2008); M.T.C., 299 S.W.3d at 481.  It provides:

[U]nless the court finds
that appointment of the parent or parents would not be in the best interest of
the child because the appointment would significantly impair the childs
physical health or emotional development, a parent shall be appointed sole
managing conservator or both parents shall be appointed as joint managing
conservators of the child.

 

Tex. Fam. Code Ann. § 153.131(a). 

            The
legal and factual sufficiency of the courts findings or implied findings may
be challenged on appeal.  Agraz v. Carnley, 143 S.W.3d 547, 554
(Tex. App.Dallas 2004, no pet.).  A
finding that the appointment of a parent as managing conservator would
significantly impair the childs physical health or emotional development is
governed by a preponderance of the evidence standard.  Tex.
Fam. Code Ann. § 105.005 (West 2008); J.A.J., 243 S.W.3d at 616.

            An
adults future conduct may be somewhat determined by recent past conduct;
however, evidence of past misconduct, in and of itself, may not be sufficient
to show present unfitness.  Whitworth v. Whitworth, 222 S.W.3d 616,
623 (Tex. App.Houston [1st Dist.] 2007, no pet.).  Specific acts or omissions of a parent
implicating a significant impairment to a childs emotional development may be
inferred from direct evidence.  Id.  However, this link between the parents
conduct and harm to the child may not be based on evidence that merely raises a
surmise or speculation of possible harm.  Id.  [I]n an original proceeding for a
conservatorship determination, even evidence that the nonparent would be a
better custodian is insufficient to support the appointment of a nonparent as
managing conservator in preference to a parent.  M.T.C.,
299 S.W.3d at 481 (quoting Lewelling v.
Lewelling, 796 S.W.2d 164, 167 (Tex. 1990)). Rather, the nonparent is
required to affirmatively prove by a preponderance of the evidence that
appointment of the parent as managing conservator would significantly impair the child, either physically or
emotionally.  Id. (quoting Lewelling,
796 S.W.2d at 167).  A nonparent may
overcome the presumption by producing evidence of a history or pattern of past
or present child neglect, or physical . . . abuse by [a] parent directed
against the other parent, a spouse, or a child. Tex. Fam. Code Ann. § 153.004(b) (West 2008).  

            B.        Factual
Background 

                        1.         B.G.M.s Medical
Condition and Treatment

            Rhonda
and Bud have been married for twenty-nine years.  Their first daughter, Tiffany, is a
twenty-five-year-old paralegal.  Their
second daughter, B.G.M., was born prematurely with cerebral palsy, a permanent,
nonprogressive condition which results in tightness of the ligaments or
tendons.  Her cerebral palsy led to
complications with her lower extremities, preventing her from walking
normally.  Because she was born to
parents living below the poverty level, B.G.M.s medical treatment was
facilitated by her receipt of Medicaid. 
Her parents took her to Dr. Marc Edman Kimball in Marion County for
regular treatment for several years.  Dr. Kimball
said B.G.M. was well at that time other than her cerebral palsy.  He emphasized that she had a normal MRI of the
head and that nothing would prevent her from learning and growing emotionally
and intellectually.  

            When
B.G.M. turned four, her parents began reviewing her schooling options.  They were afraid to place B.G.M. in regular
school because she required constant supervision.  Rhonda testified that she called a local
school to ask [i]f there would be a lot of stairways for her to crawl up and
down.  She couldnt step up real high at
the time . . . .  Rhonda was concerned
that the kids would make fun of her and laugh at her in school because she had
a limp leg.  Bud testified he also
contacted a special educator who told him to work with B.G.M. at home until she
was physically able to enroll.  Rhonda
claimed she spoke with Dr. Kimball, who agreed that it would be all right to
homeschool B.G.M.  The decision was made
that Bud would administer the homeschooling.  A MEDICAL RELEASE/PHYSICIANS STATEMENT
signed by Dr. Kimball stated that father is caring for [B.G.M.] . . . home
schooling her.  She needs
supervision.  The Markses went and got
school disk[s] and stuff like that to work with her at home on the computer and
books.  Rhonda, however, was mentally
deficient, had an eighth-grade education, and Bud only completed the tenth
grade. 

            In
2006, when B.G.M. was approximately eight years old,[1] her
parents moved to Lubbock, Texas, without their oldest daughter.[2]  B.G.M. was not taken back to Marion County
for treatment by Dr. Kimball after the move. 
Rhonda claimed that B.G.M.s disability Medicaid terminated when they
moved to Lubbock and that Dr. Kimball said that she was not too bad, and if we
needed anything to bring her back and if not, then shes okay.  Dr. Kimball referred B.G.M. to a state and
federally funded program called Early Childhood Intervention (ECI).  Bud testified that he called ECI and [a]ll
they had to offer was physical therapy which we could do ourselves.  Because he claimed, Ive been in physical
therapy.  I know how they do that.  I know how to work muscles, he did not send
B.G.M. to ECI.  B.G.M. received no
medical treatment while in Lubbock.  

                        2.         Child Protective Services (CPS) Investigation  

            In the summer of
2008, when Rhonda and Bud claimed to be living in Lubbock, they decided to
return to Marion County to fix up a trailer owned by Rhondas sister, Tarter,
as a summer home.  Tarter warned the
Markses that the trailer was not liveable; but if they wanted to mess with it,
they could.  Rhonda testified that they
repaired the entire roof so that it did not leak and that they replaced the
living room floor.  She claimed that the
family stayed with her brother and next-door neighbor Donald Wayne while they
were fixing the trailer and that B.G.M. had a bed in Waynes home.  

            Tiffany
was living in Marion County during this time and would visit during the
weekends. In spending time with B.G.M., Tiffany became concerned that her
father just said that he was home schooling her and was not providing
adequate supervision.  Tiffany claimed she
was concerned about B.G.M.s education because [t]hey would come to my house
and use my computer.  They would leave
her on the computer by herself to do this home schooling by herself.  Tiffany also testified that the trailer had
no electricity, holes in the ceiling, roaches, and that black mold was
present.  She called CPS to report her
concerns.  She added that her parents
drank alcohol and smoked marihuana. 
Tarter also said she had seen the Markses smoking marihuana maybe
twice, three times in the last year or so.[3]  Tiffanys prior experience with domestic
abuse at the hands of her father, B.G.M.s living conditions, suspected bug
problem, lack of education, and an allegation that Bud suffered from psychosis
was reported to CPS.[4]  

            Deputy
Jimmy Simplier was sent to accompany CPS investigators to the first visit of
the Markses residence.  Simplier met
with Bud, who got very irate [a]fter we identified ourselves.  Simplier testified Bud just said that [B.G.M.]
was well taken care of, and

was so upset because we were there, he told us
that he had all of these attorneys if we wanted to talk to that we needed a
warrant.  We didnt have no right to be
there that we had to have a warrant to be there.  And he wants us to get off his place, off his
property . . . . We could not explain anything to him.  He was so out of control that we could not
talk to him.

 

Feeling threatened, Simplier did
not ask permission to enter the home, but noticed that the trailer did not
appear to have electricity because there was an extension cord which ran to
another trailer home belonging to relative Aaron Estates.  

            After
reporting Buds demeanor during the first home visit, TDFPS special
investigator Patrick Hill attempted a second home visit with CPS with court
orders in hand.  Bud met him outside of
the trailer.  Hill described his
behavior:  He was very belligerent with
us.  He talked over me often. . . . Was
just generally evasive and didnt cooperate a whole lot.  In spite of this, Hill examined the
single-wide two-bedroom trailer. 
Although Bud claimed that the Lubbock address on his drivers license was
where they actually lived, B.G.M. had her own room containing personal effects
typical of a 10-year old.  Hill
testified,

It had moderate clutter in certain areas, but . .
. it didnt look very bad.  There was
some mold issues in certain places, some storage issues in other. There was
minimal food, dry goods on hand, but the biggest thing that struck me, you
know, was that it was just incredibly hot. 
It was the middle of June with no air conditioning in the residence.

 

The extension cord which was hooked
up to Estates trailer ran through the master bedroom window and plugged into a
power strip to provide electricity to a coffee maker, box fan, television, and
computer.  There was no indication of bug
or rat problems.  

            When
interviewed, Bud was described as noncooperative, but Rhonda spoke with
Hill.  She said that every now and then
[Bud] gets a roofing job and that she worked at a convenience store.[5]  Although Hill found no evidence of drug use
in the home, Rhondas interview revealed drug use.  Hill stated,

[W]hen I asked if shed used any illegal drugs in
a certain amount of time, she said that it had been seven months since she had
smoked marijuana.  When I revisited the
issued [sic] later in her interview, she recanted and said that if I was to
give her an oral swab -- and I explained to her that an oral swab general [sic]
gets about five to seven days worth of any illegal substance that might be in
the system, she said that she would fail such a test and it would be positive
for marijuana.  

 

            Next,
B.G.M. was retrieved from her uncle Waynes house.  She was thin, but not malnourished.  Hill observed that she had a distinct
limp/dragging of her left foot as she walked. 
Rhonda told Hill that B.G.M. had not been to the doctor in four
years.  B.G.M. was dressed in typical
10-year old clothes that were moderately soiled, especially the pants.  Although there was running cold water in the
trailer, Hill said, [I]t seems like it had been a handful of days since either
Mr. Marks, Mrs. Marks, or [B.G.M.] herself had bathed.  Hill noted B.G.M. had acne and for a
pre-pubescent I thought that was indicative of hygiene.  

            Rhonda
claimed B.G.M. was homeschooled on the computer and had attained a fourth or
fifth grade level of education, but admitted they did not send the results of
any test or any curriculum to any particular place to be certified.  Hill did not see any books in the home and
decided to test B.G.M.s knowledge. 
B.G.M. could only recognize the word I from the written sentence I like
cats, and could not read any of the words in the sentence Jack walks
dogs.  B.G.M. could recite even numbers,
but not odd numbers.  She could not spell
her own first name and did not know her middle name.  She knew the month, but not the year of her birth.  Hill asked her point blank if anyone told
her what she ought to say to the CPS person, and she told [Hill] that her
mother said make sure you say that you are home schooled and that youve been
living with Edith, Rhondas aunt. 

            As
a result of the investigation, and even though Hill did not find there was
evidence of danger to the child, B.G.M. was placed with Tarter pending further
investigation.

                        3.         Psychological Evaluations 

            The
Markses were required to undergo psychiatric evaluations, counseling, parenting
classes, and drug testing.  They were
allowed supervised visitation with B.G.M. 
Initially, Bud cussed the secretary out and refused to attend
psychiatric evaluation.  After the Markses
spent time in jail for contempt of the courts orders in failing to comply with
the service plan, they completed these requirements.  

            Psychologist
Donald Eugene Winsted, III, examined the Markses and B.G.M.  Winsted noticed that Bud appeared to be giving
socially desirable responses, a mechanism which Winsted called faking
good.  Bud denied having common feelings
such as anger, jealousy, and envy, and said he was unaffected by criticism,
disapproval, reassurance, and praise. 
Due to his defensiveness, Winsted was unable to form a definite opinion
about the allegation of psychosis, although Bud did not appear agitated or
paranoid during the interview.  Winsted
described Buds cognitive functioning in the low end of the average range.    

            Winsteds
evaluation of Rhonda revealed a full scale I.Q. of 62, within the mentally
deficient range.  Winsted testified that
although Rhonda was faking good, she reported having significant problems in
her family and told him she has experienced a lot of fights in her family.
He opined that [r]elationships with family members are likely to be high[ly]
conflictual and possibly violent.  He
also found that Rhonda appears to not understand or value [childrens] normal
developmental needs and concluded [t]hat is she is likely to perceive a
childs normal developmental needs as bothersome and annoying. . . . [because]
her nurturing skills are lacking.  Since
Winsted felt Rhonda is likely to value her own needs over that of her
childrens needs and only value her children when they are meeting her needs, he
concluded that she could become easily stressed with the routine tasks of
parenting.  

            Winsteds
evaluation of B.G.M. resulted in a finding that although her verbal
intelligence was 92, and was within the normal range between 85 and 115, her
nonverbal was 57, her reading was 61, spelling was 65, and her arithmetic was
60.  During the interview, B.G.M. stated
that she felt she had been neglected and that she worried a lot.  Tarter testified B.G.M. had confided that she
was abandoned with different people from time to time and that she was scared
when she witnessed her parents fighting. 


            B.G.M.
also underwent diagnostic testing with Sally Evera Tellberg of Gregg County
Special Education Services to assess her educational achievements.  Tellberg testified B.G.M. was reading at a
first grade level.  Tellberg found that
while B.G.M.s verbal intelligence, nonverbal intelligence, composite
intelligence, and composite memory were below average, her scores did not
qualify her for special education.  The
decision was made that B.G.M. would be placed in main stream education with
special educational services in the upcoming school year.  Contrary to the Markses contention that
B.G.M. was dyslexic, Tellberg did not find evidence of any learning disability.
 B.G.M. began school in the fall.  

                        4.         B.G.M.s
Counseling 

            Joann Christian met with B.G.M.
mostly every week for counseling. 
Initially, B.G.M. was very timid; very shy; very, very withdrawn, had
self-esteem issues, and appeared immature for her age.  According to Christian, [h]er vocabulary was
. . . not as extensive as it should have been.  After one month of building rapport with
B.G.M., Christian asked B.G.M. about her parents, but the very moment that
[Christian] mentioned her parents, she burst into tears and sobbed
hysterically.  Christian testified,

She had tremendous sadness that she was
experiencing and fears that she had. 
. . . And she said that I dont want to see my parents.  I dont want to talk to my parents.  I dont want to be with my parents.  She was just completely adamant at that time.  . . . She was so upset that she took her
hands and she put them over her face and buried her face in her lap and shook
as she sobbed and sobbed and sobbed. 
. . . Im thinking this child has some significant and
severe trauma that has occurred to her that would cause her to have such strong
feelings about her parents. 

 

            Recounting
another counseling session, Christian stated B.G.M.

brought up the fact that shed had to come to
court that day.  That she got to sit in
the judges office, she called it.  . . .
.  And then all of a sudden, she just
became very emotional and she started crying. 
And at that point, she said that she was scared of her father, and she
didnt want to be around him.  . . .  What she told me at that time is that she
remembered how her father would beat Tiffany, and shes afraid of him.  . . .  Later
on she stated that her parents were trying to get her to go back to live with
them by telling her that they would take her places and do things for her.  She stated over and over again during that
session that she wanted to stay with her Aunt Sally.  

 

Christian further testified, 

[I]n [B.G.M.s] verbalization, she had said that
her mom and dad used lots of drugs.  She
stated that she had moved between East Texas and Lubbock several times.  She described living in a house with no
electricity, that was down in the woods.  She stated that she had to play outside and
make mud figures and she started talking again about the volcanoes that she
would make.  She stated that she was
sometimes locked out of the house when her parents fought. 

 

B.G.M. told Christian that she
had never had friends over to play before and recounted an incident where she
poured cereal out of a box, and she had to pick roaches out of it before she
could eat it.  Tarter also testified
that B.G.M. slept with her head covered up, a habit which B.G.M. said she
developed to keep the roaches and rats from getting on her.  

            Since
B.G.M.s placement with Tarter, Christian testified she had made such great
emotional changes and development. 
B.G.M. loves school and those activities are very, very important to
her, especially since this has been the first experience shes had with
school.  B.G.M. had said Aunt Sally and
Tiffany are taking care of me, and theyre keeping me safe.  And John and Uncle Tarter are keeping my
daddy away from me.  Christian claimed
that B.G.M. did not want to see her father at all.  . . .  She
was very upset that she had been order[ed] to call them each week.  . . .  She
didnt want to talk to her father, but she did want to talk to her mother. 

                        5.         Visitation 

            Supervised
visitation began to raise concerns among the social workers.  The first set of visits occurred in Tarters
home.  CASA employee Shameka Provost
noted that B.G.M. had been in the home for approximately one week and she did
not know how to bathe herself.  B.G.M.
could not read even simple readers or primers.  Provost claimed B.G.M. would shut down and
change the subject every time whenever we talked about her living arrangement
and conditions before having come into care. 
Nevertheless, the Markses visits with B.G.M. were appropriate, and
B.G.M. was happy to see her parents.  Tarter
testified that she had even expressed a desire to go home and live with her
parents.  However, the Markses began
arriving for visitation after B.G.M.s bed time, and Tarter asked that the
visitation occur elsewhere. 

            At
this time, the Markses continually maintained that they had a residence in
Lubbock.  Provost obtained the address of
the Markses residence from their attorney and contacted CASA worker Dawn Riley
in Lubbock to investigate.  Dawn found
that the property was owned by Mr. Markss first cousin, Glen McDonald and
Mr. McDonald when she entered the property, that he was very hostile towards
her.  Riley was instructed to leave, and
McDonald followed her down the overgrown driveway of the trailer.  Riley said the trailer didnt look safe, and
[was] in various stages of disrepair. 
Further investigation revealed that McDonald had an open CPS case there
himself.  

            Visitation
was next scheduled at a local Dairy Queen. 
Provost was concerned that Bud spent time playing with her, but he
spent a large portion of that visitation talking to me and talking at me,
berating me.  She described Bud as
caustic, belligerent, and evasive.  When
questioned about her academic ability, Bud told Provost that B.G.M. was
dyslexic.  Provost included this claim in
her written report, along with a notation that B.G.M. had not been tested for
dyslexia. 

            At
the second visitation, Provost said she was met with a very unpleasant surprise
from Mr. Marks, in which he was extremely hostile and rude.  Provost encouraged Bud to play with B.G.M.,
but he did not take the suggestion. 
Provost claimed that while he was berating her, Bud would tell B.G.M.
that he loved her, that Provost was not her friend, and that Provost did not
want her to come home.  Provost testified,
It made me extremely uncomfortable.  Mr. Marks
had a quality in which it was very frightening. 
. . .  The look in his eye was
frightening to me.  He was, I felt, on the
verge of losing control.  After
consulting with her program manager, the police were called so that they could
provide an escort to B.G.M. and Tarter as they drove home. 

            At
some point in the case, the Markses moved back to Lubbock.  After their move, Tiffany and Tarter went to
inspect the trailer which the Markses had left behind to obtain a better
understanding of B.G.M.s living conditions. 
Tiffany claimed that the trailer had holes in the floor, walls, and
ceiling; that the bathroom ceiling was covered with mold to the point that it
looked like the ceiling was painted black; that rat droppings [were]
everywhere; and that [i]n every part of the house there were roaches
crawling.  Tarter also said [t]heres
still holes in that trailer.  There is
rats in that trailer, and there is roaches in that trailer.  

                        6.         B.G.M.s Wishes and the Recommendations


            Caseworker
Sarah Biddy testified that B.G.M. wanted to stay with Aunt Sally.  That is something that she had been adamant
with me about.  Tarter claimed B.G.M.
was terrified of having to go back with [her parents].  Tiffany and Provost testified that B.G.M.
indicated she would run away if she was forced to live with them again.  B.G.M.s counselor Christian reported to the
jury that B.G.M. should not be returned to her parents because she fears her
father. 

            Christian
opined that living with the Markses would be devastating to her, and would
impair her emotional development now and in the future.  Christian explained, [W]hen you take all of
those things, going to school for the first time, having friends, thats a part
of a childs normal socialization not only academic development, but their
emotional development.  Provost believed
that toward the conclusion of the case, B.G.M. became mad that she had been
living the way that she was.  And having
lived in a different way and probably in better condition highlighted for her
that she was not living in a safe environment prior to coming into care.  Provost testified the Markses insistence
that B.G.M. was dyslexic was also damaging; she testified, One of the things
that she said to me is that now, that Im in school, I realize that Im not
dumb.  Provost told the jury that going
back to her parents would impair B.G.M.s emotional, social, and even physical
development considering that the Markses had not taken advantage of free
services to obtain proper medical care.  

            Despite
the fact that she had intervened in the suit and sought conservatorship of
B.G.M., Tiffany testified, I feel that Aunt Sally has provided her with a safe
home as much as what I would have done too. 
The school district that she is in is more equipped and prepared for
[B.G.M.] in the educational needs that she needs versus the school district
that Im in.  Tiffany said that B.G.M.
is happy with Tarter and that it was in her best interest to remain with
her.  

            C.        The Section 153.131 Presumption Was
Rebutted 

            Again, the trial court is afforded
broad discretion in deciding the conservatorship of a child.  Gillespie, 644 S.W.2d
451.  Our review of this evidence leads
us to conclude that appointment of B.G.M.s parents as managing conservators
was not in B.G.M.s best interest.  We
find that TDFPS proved that such appointment would significantly impair
B.G.M.s physical health or emotional development by a preponderance of the
evidence.  

                        1.         Physical Health

            With
respect to B.G.M.s physical health, the record shows that despite B.G.M.s
diagnosis of cerebral palsy, and recommendation and referral by Dr. Kimball
that she attend physical therapy, B.G.M. received no medical care for several
years while living with her parents in Lubbock. 
Instead of taking advantage of free physical therapy through ECI, Bud
decided he was qualified to administer the therapy on his own.  When Hill saw B.G.M., she had a distinct
limp/dragging of her left foot as she walked. 
Since her placement with Tarter, Kimball testified B.G.M. was given
braces and was walking better, and by my last report, she was actually able to
run a little bit.[6]  

            Dr.
Kimball testified that living in unsanitary conditions could affect B.G.M.s
physical health.  Testimony from
witnesses, though contested, was sufficient for a rational fact-finder to
believe that the trailer was infested with roaches and rats.  Hill testified B.G.M. bathed about once a
week despite the hot June weather and lack of air conditioning.  According to Provost, she was unable to bathe
herself when she was first removed from the home.  Hill believed B.G.M.s acne, which cleared
after placement, was due to a lack of hygiene. 

            Hill
said that the trailer contained food. 
While B.G.M. was not described as malnourished, she was very tiny, very
small.  She went from a size 5/6 to a
size 16/18 during the case.  Christian
testified B.G.M. was happy to have food. 
Tarter said, [W]hen she eats, she acts like shes never eaten, but I
know that she has.  But she just eats
like over and over.  

            The
combination of the facts above was sufficient for a rational fact-finder to
conclude that B.G.M.s return to her parents would significantly impair her
physical health. 

                        2.         Emotional Development 

            The
evidence of significant impairment of emotional development was more
noteworthy.  Bud was allegedly
homeschooling B.G.M. on the computer.  It
is undisputed that no results of any homeschooling activities were sent for
credentialing.  When asked why B.G.M.s
level of academic achievement was that of maybe a kindergartner for a ten-year-old
child, Bud and Rhonda insisted it was because B.G.M. was dyslexic, even though
she had never been tested.  

            After
her placement, testing revealed that B.G.M. had no learning disabilities.  After her first year of school while in
Tarters care, B.G.M. was tested on the fourth grade level and met the States
standard for math.  While she still
needed special assistance with reading and writing, B.G.M. was promoted to the
fifth grade.  April Hayes, a CPS Advance
Specialist IV, testified that even if her parents decided not to enroll B.G.M.
in public school, they could have enrolled her in a head start program designed
for disabled children and children coming from low-income families.  This constituted evidence that B.G.M.s
educational needs were not being met.[7]
 

            As
a reviewing court, we may consider concepts of psychological parenting,
bonding, and the depth of attachments to parental figures in the context of the
evidence presented.  See In re De La Pena, 999 S.W.2d 521, 529 (Tex. App.El Paso
1999, no pet.).  B.G.M. had told her
counselor that she was left with different people from time to time, felt
abandoned sometimes, and that she would be locked out of her home on occasion
when her parents fought.  Winsted said
Rhondas nurturing skills were lacking, that she would perceive normal
development needs as bothersome and annoying, and that she could become easily
stressed with the routine task of parenting. 
Buds psychological evaluation was inconclusive as he was defensive and
denied feeling common emotions.  Yet,
Tiffany described him as psychotic, and caseworkers and officers consistently
referred to him as belligerent.  He
cursed at caseworkers, threatened them, and neither parent completed services
ordered by the court until after being thrown in jail for contempt.  Most telling was B.G.M.s repeated statements
to Tarter, Tiffany, caseworkers, and counselors that she was afraid of her
father and that she did not want to live with her parents.  

            We
recognize that safety, security, and stability are factors critical to child
welfare, and depending on the circumstances of each case, the danger from
uprooting a child may rise to the level of significantly impairing the childs emotional
development.  Id.  Significant impairment
has been inferred from uprooting a child from a nonparental caretaker when the
removal would be devastating or akin to psychological amputation or cause
serious psychological damage.  See In re J.C., No. 14-10-00262-CV, 2011
WL 2802927, at *4 (Tex. App.Houston [14th Dist.] July 19, 2011, no pet. h.)
(quoting In re Rodriguez, 940 S.W.2d
265, 273 (Tex. App.San Antonio 1997, writ denied)).  B.G.M. had stated to Christian and Provost
that she did not feel that she was safe in her previous living conditions, that
Aunt Sally and Tiffany are . . . keeping me safe, and that their husbands
were keeping my daddy away from me. 
Also, Christian, Provost, Tiffany, and Biddy all testified that B.G.M.
wanted to remain with Tarter and that it was in her best interest to do
so.  Christian testified B.G.M. had made
such great emotional changes and development [that] removing her from that
would be devastating to her.  

            We
find the evidence presented sufficiently demonstrated that appointing Rhonda
and/or Bud managing conservator(s) was not in B.G.M.s best interest because
such appointment would significantly impair B.G.M.s physical health or
emotional development.  Therefore, we
overrule the Markses first point of error. 


II.        Admission of Hills
Affidavit and the Contact Log Narrative 

            A trial courts
decision to admit or exclude evidence is reviewed for abuse of discretion.  Good v.
Baker, 339 S.W.3d 260, 270 (Tex. App.Texarkana 2011, no pet.) (citing Interstate Northborough Pship v. State,
66 S.W.3d 213, 220 (Tex. 2001)).  During Hills direct testimony, TDFPS
sought the admission of his affidavit which was attached to their PETITION FOR
ORDERS IN AID OF INVESTIGATION OF A REPORT OF CHILD ABUSE.  They also sought admission of Hills Contact
Log Narrative containing Hills observations and notes during the
investigation.  The trial court admitted
these documents as a summary of Hills testimony subject to cross-examination. 

            Our
review of these documents and the record leads us to conclude that neither of
these documents can be considered as a summary of Hills testimony.  Prior to admission of the affidavit, there
had been no testimony of the following damaging statements contained within: 

Marks . . . is alleged to have mental problems
possibly including psychosis.  Mr. Marks
is alleged to be very paranoid and [sic] gets agitated to an extreme.. . .
 Mr. Marks is described as very
controlling in the report.  . . . There
are allegations of past domestic violence in the home between Mr. Marks and his
wife, Rhonda Marks.  . . .  The . . . family has a history of mental
disorders including a sister who is a paranoid schizophrenic and a mother who
may also be a paranoid schizophrenic. 
The reporter said that Mr. Marks has had guns in the home in the past.  . . . 
Mr. Marks is a violent person and that CPS employees should probably
take law enforcement with them when they go to the residence.  . . . Mr. Marks is very paranoid
and that he thinks that people are staring at him.  . . . . 
Ms. Parsley stated that Mr. Marks has threatened to relocate with
[B.G.M.] but she believes he lacks the funds to do so.  

 

Further, it was readily apparent
from the affidavit that Hill did not have personal knowledge of the facts
included therein.  We find Hills
affidavit constituted hearsay, was not subject to any hearsay exception, and
that its admission was erroneous.[8]  

            TDFPS
offered the contact log narrative as a business record, laying the proper
predicate required.  Additionally, the
contact log narrative appears to be a public record and report under Rule
803(8) of the Texas Rules of Evidence. 
Under this Rule, [r]ecords, reports, statements, or data compilations,
in any form, of public offices or agencies setting forth:  . . . (B) matters observed pursuant to a duty
imposed by law . . . or (C) in civil cases as to any party . . . , factual
findings resulting from an investigation made pursuant to authority granted by
law do not constitute hearsay unless they indicate a lack of
trustworthiness.  Tex. R. Evid. 803(8)(C). 
The contact log narrative appears to track Hills observations made
during the investigation.  Therefore, we
cannot conclude that the trial court abused its discretion in admitting the
contact log narrative.  

            To
obtain reversal for any error arising from the admission of Hills affidavit,
the Markses must show that the error probably resulted in an improper
judgment.  Good, 339 S.W.3d at 273 (citing Interstate
Northborough Pship, 66 S.W.3d at 220). 
We review the entire record in making this determination.  Id. (citing
Nissan Motor Co. v. Armstrong, 145
S.W.3d 131, 144 (Tex. 2004)).  The
complaining party must generally demonstrate that the judgment turns on the
particular evidence admitted.  Id. 
The evidence detailed in our opinion above was not derived from the
affidavit.  Rather, in looking at the
testimony of Hill (and making sure to exclude responses to his
cross-examination regarding the affidavit conducted after its admission), and
other witnesses in the case, we concluded the evidence was sufficient to
support the trial courts judgment. 
Therefore, we cannot say that admission of Hills affidavit was
reasonably calculated to cause and probably did cause rendition of an improper
judgment in the case.  

III.       Conclusion


            We
affirm the trial courts judgment. 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          July 26, 2011

Date Decided:             August 4, 2011

 











[1]B.G.M.
was born on February 2, 1998.  

 





[2]Tiffanys
relationship with her parents was strained. 
In 2003, when she was nineteen years old, Tiffany married a man her
parents had never met.  At the time of
trial, Tiffany was twenty-five and her husband, John, was forty-two.  The Markses attempted to talk her out of
marrying John when she revealed her intention. 
Tiffany testified,  

 

When
I moved out, I moved in with my best friends mother.  I stayed there for approximately two
weeks.  My father had my mother come to
the house that I was staying at almost daily threatening me to the point that I
got to where I just decided I was going to move in with John who is now my
husband.  My mother came to that house
and practically kidnapped me.  She
convinced me to go to lunch with her. 
Instead of going to where we were going to lunch, she took me directly
to their house.  I walked into their
house, and he assaulted me the second that I got into that house.  He sat on top of me and he punched me in my
face until I was black and blue, until there was blood in my eyes.  

 

A restraining order was filed against Bud,
and Tiffany remained in Marion County after her family moved to Lubbock in
2006. 





[3]The
drug tests taken by the Markses in September and November of 2008 were
negative.  

 





[4]Tiffanys
concern about the mental health of her father was prompted by an incident in
which he was talking about how everybody . . . around him was looking at him,
staring at him, just utter paranoia.  He
at one point said that me and my husband had all these people watching him . .
. . It was at that time, he got to the point it was just insane.  I had to leave.  He got -- he had this look in his eyes that
he had whenever he was basically beating me when I was trying to move out.  That scared me to the point that I had to
leave.  . . . I ran and he followed me.  





[5]Tiffany
claimed that her father had never had a steady job.   





[6]Kimball
testified that there were no signs that B.G.M. failed to receive medical care
during the gap in treatment.  He was also
uncertain whether having braces earlier would have helped.  Rhonda testified that she would take B.G.M.
to the doctor as often as recommended if she was returned.  However, we cannot say that the trial court
abused its discretion in finding B.G.M.s return to her parents would
significantly impair her physical health considering the Markses history of
medical neglect and philosophy about necessary medical treatment. 





[7]During
trial, Rhonda testified that B.G.M. could go to a different public school in
the district where the Markses currently resided, although B.G.M. expressed
resistance to moving.  





[8]Our
review of TDFPSs briefing reveals that it focused on whether any error caused
harm instead of addressing whether the admission of these documents was
erroneous.